COAL & COKE RY. CO. et al. v. NEASE.

(Circuit Court of Appeals, Fourth Circuit. July 7, 1913.)

No. 1,141.

CONTRACTS (§ 322*)—PERFORMANCE—ACCEPTANCE BY PARTY—ESTOPPEL.

Complainant and associates entered into a contract with second parties relating to certain coal options acquired by the respective parties which were conveyed to a trustee. The second parties undertook to organize a corporation to repay advances made in the purchases and complete payment for the property, and to develop and operate the same, paying complainant a royalty on the production. The second parties were also to procure money to finance the operation, and to complete a railroad to the property. In case they failed to do such things by a date specified, complainant and his associates were to receive an undivided $49/100$ interest in the property in specie. Within the time fixed the second parties organized a corporation which contracted to carry out such agreement, and also presented a man who contracted to finance the mining and complete the railroad. Repayment of complainant's advances was tendered; but he refused it, and brought suit to enjoin the trustee from conveying the land and to recover $49/100$ thereof. Some months later he dismissed the suit and accepted the money, and the corporation completed payment for the lands. *Held*, that by such action complainant accepted the contracts made by the second parties as a compliance with their agreement, and could not, several years later, maintain a new suit to recover the specific interest in the property against another corporation which had in the meantime purchased it and executed a mortgage thereon, with other property, to secure a large issue of bonds outstanding in the hands of innocent purchasers.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1465, 1534; Dec. Dig. § 322.*]

Appeal from the District Court of the United States for the Northern District of West Virginia, at Parkersburg; Alston G. Dayton, Judge.

Suit in equity by David A. Nease against the Coal & Coke Railway Company, the Washington Coal & Coke Company, and others. Decree for complainant (195 Fed. 987), and defendants appeal. Reversed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

B. M. Ambler, of Parkersburg, W. Va. (Van Winkle & Ambler, of Parkersburg, W. Va., on the brief), for appellants.

W. E. Chilton, of Charleston, W. Va., and C. D. Merrick, of Parkersburg, W. Va., for appellee.

Before PRITCHARD, Circuit Judge, and BOYD and SMITH, District Judges.

SMITH, District Judge. The appellee, David A. Nease, filed a bill against the appellants on the 8th of May, 1909, praying that he be decreed entitled to an undivided interest of $49/100$ of coal lands and coal interests mentioned and described in the bill of complaint, and that the same be partitioned and set off to him, and, if it be impossible to partition and set off the same in kind, that all of the said coal lands and coal rights be sold for partition, and that $49/100$ of the proceeds be paid over to the complainant. The defendants filed demurrers which on the 31st day of March, 1910, were overruled, and thereupon the defendants filed their answers, and, the cause being at issue, testimony was taken, and on the 23d of April, 1912, the court below rendered its opinion upholding the contention of the complainant, and on the 14th of June, 1912, a final decree was accordingly entered decreeing the plaintiff to be entitled to an undivided interest of $49/100$ of all of said coal and coke lands containing about 26,000 acres situated in the counties of Gilmer, Braxton, and Lewis in the state of West Virginia, and was further entitled to a sale thereof in case a partition in kind could not be had, and to $49/100$ of all the proceeds of sale less certain deductions in procuring and paying the purchase money for the same.

The facts, briefly stated, appear from the record to be as follows: In 1899 Henry C. Jackson and two others were the owners of a majority of the stock of the Little Kanawha Railroad, and were procuring options for the purchase of coal lands and coal interests in the counties of Gilmer, Lewis, and Braxton. The present complainant, David A. Nease, was also negotiating and attempting to procure options upon coal lands at the same time in the same counties. On the 25th day of November, 1899, Jackson and his associates entered into an agreement with Nease and his associates, whereby they agreed to organize a coal company to take over and acquire coal options procured by both parties, respectively, each party contributing $5,000 with which to secure them, and all coal rights secured to be held jointly, one half interest belonging to Johnson and his associates, and the other half interest belonging to Nease and his associates. A controversy arose between the parties leading up to litigation by the Jackson party against Nease; but all controversies and litigation were settled by a new agreement which was entered into between Nease and his associates of the first part, Jackson and his associates of the second part, and one George Gillmor, trustee, of the third part, and V. B. Archer of the fourth part. This contract, which was dated May 5, 1900, superseded and did away with all previous contracts between the parties, and became the one binding contract, fixing the rights of the

parties, and is the contract upon which the right of the complainant, D. A. Nease, in these present proceedings is based. According to this last contract of May 5, 1900, all the coal options and rights were to be held in trust by George Gillmor as trustee, and he was to convey them to a new corporation to be organized by Johnson and his associates upon their request. Before making conveyance under this agreement, however, Gillmor was to acquire from this new corporation a duly executed and acknowledged agreement, whereby this new corporation should undertake to pay all the unpaid purchase money to be paid under the options, it was to bind itself not to lease the coal or any part thereof to any concern or persons, retaining to the corporation an interest in the lease, and further was to undertake to pay to Nease and his associates a royalty on all coal mined from lands covered by the said coal rights and options equal to one-fifth of the amount of the average prevailing royalty paid on coal of like character and mined under similar conditions in the vicinity or region where and at the time that such coal is actually mined, said royalty to be payable monthly.

The new corporation was further to agree that the representative nominated by Nease and his associates should have free access to the coal lands and rights to be conveyed to it, and they were also to have free access to the books of the said new corporation for the purpose of establishing how much coal was actually mined. The new corporation was further to undertake not to mine any other coal as long as the said 25,000 acres covering the said coal lands and interests could be mined as profitably as any other coal owned or controlled by the corporation. In addition to all this, before making a transfer to the new corporation of the interests held by him as trustee, Gillmor was to require that all moneys paid to him by Nease and his associates and Jackson and his associates should be refunded to him by the new corporation, and thereupon Gillmor was to immediately pay the same over to Nease and his associates and Jackson and his associates in the same proportions in which they had been contributed by them. It was further provided in this contract that Jackson and his associates should make diligent efforts for the financing of the new corporation and for causing the construction of a railroad to the coal lands and coal interests above mentioned, and that, if Jackson and his associates should not on or before December 1, 1900, substantially arrange with some responsible person or persons for financing the construction of a railroad to the said coal lands and for financing the new corporation, and perform or cause to be performed the provisions of the contract with reference to the repayment to Nease and his associates of the moneys advanced by them, then and in that event the rights, interests, and shares of the respective parties in the coal lands, rights, and property above referred to should be finally fixed, determined, and defined as follows, viz.: Nease and his associates to have $49/100$, and Jackson and his associates to have $51/100$ of said property. This contract was duly acknowledged and admitted to record in Lewis, Gilmer, and Braxton counties in November, 1900. Under these contracts Nease and his associates advanced in all $11,200 to secure the options

as required by Gillmor, the trustee, and Jackson and his associates advanced a similar sum.

On the 17th of November, 1900, Jackson and his associates executed a contract with one B. E. Cartwright. The contract was between B. E. Cartwright of the first part, and Jackson and his associates of the second part, Gillmor, trustee, of the third part, and the Little Kanawha Railroad Company of the fourth part. Under this contract Cartwright was declared to be ready in conjunction with the parties of the second part to perform or cause to be performed all of the acts under the agreement of May 5, 1900, to entitle Jackson and his associates to require Gillmor, trustee, to account to them for all of the proceeds, benefits, and profits from the coal and coke rights in his name, except the royalty therein provided for Nease and his associates, and thereupon it was agreed that the parties should at once form the new coal corporation referred to in the agreement of May 5, 1900, to which Gillmor, as trustee, was requested to transfer the options so soon as its organization was effected and the receipt by him of the money and the undertakings specified in the agreement of May 5, 1900. Cartwright agreed to subscribe and pay in cash for enough of the stock of the new corporation to enable it as soon as organized to pay to Gillmor, trustee, the money which Gillmor was to repay to Nease and his associates and Jackson and his associates, and also to make any future payments required under the coal options and agreements, and to furnish it with sufficient money, if any required, to operate said coal, should the operation thereof by the company itself be deemed by it wise and to its best interests. Further, Cartwright agreed to pay the Little Kanawha Railroad Company $25,000 in cash, as needed to meet its exigencies, and to pay all of its outstanding indebtedness, and supply the necessary funds needed to extend it to the coal field. In case Cartwright made default, the railroad company was to retain the $25,000 as liquidated damages.

On November 23, 1900, the Braxton Coal Company was chartered with Cartwright and Jackson and others as incorporators, and seven days after the attorney for Gillmor, trustee, tendered to Nease the $11,200, which had been advanced by him. Nease refused this payment, upon the ground, first, because the contract just mentioned of November 17, 1900, which was shown to him, was not in his judgment a compliance with the contract of May 5, 1900; second, because Cartwright was not a man of sufficient financial ability to comply with the requirements of the contract of May, 1900. On the 28th November, 1900, an agreement was entered into between the Braxton Coal Company and George Gillmor, trustee, which recited that the Braxton Coal Company had paid to Gillmor all moneys to be paid the parties under the contract of 5th May, 1900, and then proceeded on the part of the Braxton Coal Company in consideration of the premises and of the conveyance to be made to it by Gillmor, trustee, of the coal options and coal rights held by him to covenant and agree to perform and abide by all the conditions required by the agreement of 5th May, 1900.

Thereupon Nease, on December 7, 1900, filed his bill in equity in the United States Circuit Court for the Northern District of West Virginia, setting forth the facts as substantially hereinbefore given, charging that the agreement of the 17th of November, 1900, was not in compliance with the agreement of May 5, 1900, and that Cartwright was financially unable to comply therewith, and that the agreement of 28th November, 1900, was invalid, and praying that Gillmor, trustee, be enjoined from transferring to the Braxton Coal Company the coal options and interests, and also on the part of Nease tendering the sums necessary to pay his share of the purchase price for the coal embraced in the options, and asking that he be decreed to be the holder of $^{49}/_{100}$ undivided interest therein On the 21st of January, 1901, Nease received from Gillmor, trustee, $11,200, being the amount contributed by him and his associates as payment for the coal options and coal rights held by him, as trustee, in Gilmer, Lewis, and Braxton counties, comprising about 25,000 acres, which amount was refunded under the terms of the contract dated May 5, 1900, and also under the agreement mentioned and required under the agreement of May 5, 1900, to be executed by the Braxton Coal Company of West Virginia of the first part, and George Gillmor, trustee, party of the second part, dated November 28, 1900 It will be seen, therefore, that on the 21st of January, 1901, Nease knew of the agreement dated the 28th of November, 1900, which had been executed between the Braxton Coal Company and George Gillmor, trustee, as being the agreement to be executed by the Braxton Coal Company as the new coal corporation referred to in the agreement of May 5, 1900, upon the execution of which Gillmor was to convey to the Braxton Coal Company as such new corporation the 25,000 acres of coal lands, and it further appears that on January 21, 1901, Nease accepted from Gillmor, trustee, the repayment to him of the $11,200 advanced by Nease and his associates to secure the coal options, which was to be repaid to him under the terms of the contract of May 5, 1900. Four days later, viz., on the 25th of January, 1901, Nease dismissed his bill of complaint against Gillmor, trustee, and the Braxton Coal Company.

In the meantime, Gillmor, trustee, had conveyed by deed, recorded in Braxton county on December 20, 1900, the coal rights and options held by him to the Braxton Coal Company. On November 2, 1901, the Braxton Coal Company conveyed all the coal rights and options conveyed to it by Gillmor, trustee, to Richard C. Kerens, as trustee, for a consideration of $17 per acre. This deed to Kerens, trustee, expressly refers to the contract of May 5, 1900, and is made subject to its terms, which provide for the payment of one-fifth as his royalty to Nease of the coal mined. This deed was duly recorded. Kerens was to complete all payments due for the purchase money of the coal lands and coal rights and options, which he apparently did. Richard C. Kerens on November 28, 1903, executed a deed in his own right and as trustee, together with Stephen B. Elkins and his wife and Henry G. Davis, conveying this same coal and coal rights to the Washington Coal & Coke Company, a corporation. In this deed it is recited that Kerens had taken title to all these coal and coal rights in trust for himself and

207 F.—16

Davis and Elkins, and the deed of conveyance to the Washington Coal & Coke Company also refers to the contract of May 5, 1900, and is made subject to the royalty therein. This deed was duly recorded. By a deed dated January 23, 1904, the Washington Coal & Coke Company conveyed all these coal lands and coal interests to the Coal & Coke Railway, subject to all conditions contained in the deed to it from Kerens, Davis, and Elkins of November 28, 1903. The Coal & Coke Railway Company had on October 1, 1903, executed to the Trust Company of West Virginia a general mortgage on all its road, branches, coal and coke lands in the counties of Randolph, Barbour, Upshur, Braxton, Gilmer, Clay, and Kanawha, aggregating about 100,-000 acres, which the Coal & Coke Railway was then engaged in acquiring. Under an after-acquired clause in this mortgage the 25,000 acres of coal lands and coal rights formerly held by Gillmor, trustee, upon its acquisition by the Coal & Coke Railway became subject to its mortgage. Of the bonds acquired by this mortgage some $4,500,000 have been issued since the conveyance to the Coal & Coke Railway Company of the said coal and coal rights, and are now outstanding in the hands of innocent holders.

On the 7th of April, 1903, Nease and his associates filed a bill of complaint against Braxton Coal Company, Jackson and his associates, Elkins, Davis, Kerens, and others, and George Gillmor, trustee, setting out the facts in the case chronologically, and praying that the defendants, George Gillmor, trustee, and the Braxton Coal Company, and Richard C. Kerens, be required to convey to Nease $^{49}/_{100}$ undivided interest in said 26,000 acres of coal lands. An amended bill of complaint was filed in this cause in December, 1903; but, so far as the record discloses, nothing further seems to have been done, except that in 1905 demurrers filed to the bill of complaint by H. C. Jackson, S. B. Elkins, Henry G. Davis, and Richard C. Kerens for want of jurisdiction were sustained, and on the 19th of June, 1906, a final decree was made dismissing the bill for want of jurisdiction. The bill of complaint now before the court and filed on the 8th day of May, 1909, is therefore the third bill of complaint filed by Nease, and he sets up as the ground of his equity in this case that a fraud has been practiced upon him by Jackson and his associates, in that matters had been concealed from him which he was entitled to know, and the concealment of which from him affected the action which he had taken; that on the 17th of November, 1900, two contracts between Jackson and his associates and Cartwright were executed, but only one of which were shown to him. And by the second agreement between Jackson and his associates and Cartwright, which was not shown to him, it had been agreed that, in order to carry out the first agreement of that date, which had been shown to him, there was to be organized a new corporation to be known as the consolidated company, which was to take over the properties to be conveyed to the new coal corporation mentioned in the agreement of May 5, 1900, and also the Little Kanawha Railroad Company, in which Nease had no interest. The agreement further mentioned that, in case Cartwright should fail to finance the consolidated company within 12 months from its date, then Jackson and his associates had the right to repay to Cartwright the $25,000

which would be forfeited to the Little Kanawha Railroad Company under the contemporaneous agreement, and then they should succeed to all the rights and interests of Cartwright.

Complainant in his bill rests strongly on the alleged concealment from him of the second agreement dated 17th November, 1900, between H. C. Jackson, the Little Kanawha R. R. Co., A. B. White, G. E. Newlon, W. W. Jackson, George Gillmor, trustee, and B. E. Cartwright. It is difficult to see, however, how the concealment of this contract could have in any wise prejudiced Nease. Nease alleges it was concealed from him; but a paper cannot be said to have been concealed from another when its disclosure was not called for by any obligation to him, and when its concealment could not operate to deprive him of any of his rights. The rights of Nease were fixed by the agreement of May 5, 1900. Whatever rights he had in the matter were those that he held under the terms of that deed. If he received the rights given to him by that deed, then he had no cause to complain. By that deed he agreed that George Gillmor, trustee, was bound to convey the coal options and the coal rights held by him as trustee to a new corporation to be organized not by Nease, but by the parties of the second part, viz.: H. C. Jackson, Albert B. White, Dennis O'Brien, G. H. Newlon, and W. W. Jackson. Gillmor, trustee, was to convey all these interests to the new corporation upon the request of these parties of the second part. At the time of such conveyance and before transferring the interests to the new corporation, however, Gillmor was to require from said new corporation an agreement duly executed and acknowledged to the effect set forth in section 4, subdivisions (b), (c), and (d) of said agreement of the 5th of May, 1900, and section 6 of said agreement. Gillmor, trustee, had no discretion in the matter. Upon the organization of the new corporation by the parties of the second part named in said agreement and their request he was bound to transfer all the coal options and coal rights to the new corporation, upon the new corporation paying the amount required by section 6, and executing the agreement required by the subdivisions mentioned of section 4 of said agreement. The only thing that would affect it would be the stipulation in section 11 of the agreement that, if the parties of the second part thereto should not before December 1, 1900, have substantially arranged with some responsible person or persons for financing the construction of a railroad to the coal lands and for financing said corporation, and have performed or caused to be performed the provisions of the contract with reference to the repayment to the parties of the first part (Nease and associates) of the moneys advanced by them, then and in such event the parties to the agreement were to hold the coal rights and coal property according to certain definite proportions.

The testimony shows that the parties of the second part did, prior to the 1st of December, 1910, organize a new corporation and they did, prior to that date, arrange for a person by them submitted as responsible for financing as required by the agreement of May 5, 1900, and the person so submitted was known to Nease, for he was made fully aware of the agreement of the 17th November, 1900, which disclosed these facts. Nease, however, was dissatisfied, and on the 7th

day of December, 1900, filed his bill in equity in the U. S. Circuit Court for the Western District of Virginia, to have Gillmor enjoined from making any conveyance to any such new corporation, to set aside the contracts of November 17, 1900, and November 28, 1900, and to have Nease himself decreed to be the owner and holder of an undivided interest of $49/100$ in all of said coal options and rights.

At the time of filing his bill Nease was fully aware of the contents of the agreement between Gillmor, trustee, and the Braxton Coal Company, dated 28th November, 1900, which recited the contract of the 5th of May, 1900, recited that the Braxton Coal Company had refunded to Gillmor, as trustee, the moneys paid to him by the parties to the contract of May 5, 1900, recited that Gillmor was to transfer to the Braxton Coal Company all of the coal options and coal rights, and contained, on the part of the Braxton Coal Company, all the covenants and stipulations required to be made under the terms of the agreement of May 5, 1900, by the new corporation to which Gillmor should convey. It is not shown how the agreement of the 5th of May, 1900, had not been fully carried out. The parties of the second part had organized the new corporation; they had found a man that they submitted as capable of financing it; the new corporation had paid to Gillmor the amount to be repaid by him to the parties to the contract of May 5, 1900. Gillmor had been requested to convey the coal options and coal rights to this new corporation, and before procuring the conveyances the new corporation had executed an agreement duly acknowledged, containing all the covenants and stipulations required by the agreement of 5th of May, 1900. All these matters were known to Nease. The contracts both of the 17th of November, arranging for the financing with Cartwright, and the contract of the 28th of November, 1900, between Gillmor and the Braxton Coal Company were known to Nease. He at first refused to receive the $11,200 to be paid to him, and he actually went into court and filed his bill of complaint raising all the questions, desiring that these contracts of 17th of November, 1900, and 28th of November, 1900, should be set aside as not in accord with the agreement of the 5th of May, 1900, and praying in that bill, as he does in the bill now before the court, that there having been a failure on the part of the parties of the second part to perform as they were required to perform by the agreement of May 5, 1900, before December 1, 1900, that he be decreed to be the owner and holder of an undivided interest of $49/100$ in these coal interests.

Having taken this view and with all this knowledge before him, Nease then, on the 21st of January, 1901, does receive from George Gillmor, trustee, the sum of $11,200, to be refunded to him by the new corporation in pursuance of the terms of the agreement of 5th of May, 1900. In addition to this, on the 21st January, 1901, upon motion of Nease himself, a consent decree was entered in this cause which he had filed, dismissing his bill.

It is difficult to see in what way Nease could have more openly and finally indicated his assent to and acceptance of the agreements of 17th of November, 1900, and 28th of November, 1900. With full knowledge of those agreements, and in face of his having filed in court a proceeding in equity to set them aside, he has proceeded by his own

motion to dismiss that bill, and accepted the sum of $11,200, to be paid him as stipulated in those agreements. What follows after these agreements, the subsequent conveyances made, the mortgage entered, do not in any wise affect Nease's rights. He agreed and assented that these agreements were performance of the requirements to the effect covered by these agreements in the contract of May 5, 1900, and his act was in substance to agree that he accepted these agreements as performance of that contract, and to abandon any claim to a $^{49}/_{100}$ interest in the land or coal rights themselves. All subsequent conveyances posterior to the date of these two agreements made in November, 1900, have been made subject to Nease's rights as declared in these agreements and in the contract of May 5, 1900. Whatever rights those agreements gave him he has the power to enforce against the present holder of the coal rights and options. They do not, however, include the right to him to have a $^{49}/_{100}$ interest in the specific coal interests themselves. Under the terms of the agreement of 5th of May, 1900, when the matters to be performed by the parties of the second part were performed prior to December 1, 1900, Nease lost any right to an interest in the coal land itself, and was limited to his royalty, and the enforcement of the other stipulations embodied in the contract of the 5th of May, 1900, and the agreement on the part of the Braxton Coal Company and Gillmor, trustee, of the 28th of November, 1900, so far as the same are chargeable upon the parties themselves and upon the coal rights and interests in the hands of the present holder. The present holders in substance are the innocent holders of the bonds secured by the mortgage to the Trust Company of West Virginia. That company holds a mortgage upon these coal rights and lands given by the holder of the rights therein conveyed by Gillmor under the agreements of the 5th of May, 1900, the 17th of November, 1900, and the 28th of November, 1900, and accepted by Nease. The holders of these bonds are innocent holders of the same without notice, and, as such, entitled to the benefit of the security they have taken relying upon the conveyances made by Gillmor, trustee.

The holders of these bonds had the right to infer from the inspection of the record that Nease had accepted the deeds of 17th of November, 1900, and the agreement and conveyance of 28th of November, 1900, between Gillmor, trustee, and the Braxton Coal Company, as performance of the agreement of 5th of May, 1900, and that Nease no longer claimed any interest in the specific coal and coal rights beyond his royalty as stipulated in the deed from the Braxton Coal Company to R. C. Kerens on the 2d of November, 1901.

The entire amount paid out by Nease was $11,200. This amount he has been refunded. The coal rights referred to in the agreement of 5th of May, 1900, were not owned and paid for by the parties thereto. Those parties including Nease had only acquired *options*. To convert these options into ownership required the payment of about $250,-000 additional to be paid largely before the 15th of January, 1901. A large part of this amount would have had to be paid between 1st of December, 1900, and 15th of January, 1901, say within 46 days after the time limit of 1st of December, 1900, as stipulated in the agreement of 5th of May, 1900. Of this Nease and his associates

would have had to pay 49 per cent. By reason of the arrangements made by the parties of the second part to the agreement of May 5, 1900, the result was the purchase price of these coal options was paid and the property acquired. To the payment Nease contributed not one cent. He accepted the repayment of the $11,200 originally paid out by him. His interests, whatever they are, have been acquired without cost to him. He accepted this $11,200 on the 21st of January, 1901, after the 15th of January, 1901, when he must have known that the options had expired unless saved by the agreements of 17th of November and 28th of November, 1900. The deed from the Braxton Coal Company to R. C. Kerens was recorded in November, 1901. The deed from R. C. Kerens to the Washington Coal & Coke Company was recorded in February, 1904. The deed from the Washington Coal & Coke Company to the Coal & Coke Railway Company was recorded in March and April, 1904. These deeds, if not constructively known to Nease, could have been ascertained by any sufficient examination.

So far as the record discloses Nease has never, prior to the present bill, paid or offered, outside of the allegations in the bills dismissed, to pay any part of the $250,000 cost price of these coal interests. He has not even returned or offered to return the $11,200 refunded to him. The decree of the learned judge who tried the cause below would require Nease *now* to bear his due share of the cost of these properties; but the equity to be considered is more whether he was willing and able to do so in December, 1900, and January, 1901. At those dates when it was necessary to bear that expense he was willing to leave it to be met by the financing arrangements made by the Braxton Coal Company, and allowed the record to speak to that effect to subsequent purchasers. The learned judge who heard the cause below construed the agreement of 5th of May, 1900, as recorded, as notice to all subsequent purchasers that the means to build the railroad, pay for the coal, and to conduct mining operations should be secured within seven months from 5th of May, 1900. and that the railroad should be actually built and mining operations commenced within a reasonable time thereafter, and with notice also that a failure in these respects would vest absolutely in Nease $^{49}/_{100}$ of the coal interests involved. In this we think he erred. That agreement was only notice that on or before 1st of December, 1900, a new corporation should have been organized, that the parties of the second part should have "substantially arranged" with some responsible party for financing the construction of the railroad and of the corporation, and should have performed or caused to be performed the provisions of the contract with reference to the repayment to Nease and his associates of the $11,200 advanced by them, or in default of all thereof Nease should have $^{49}/_{100}$ interest in the coal interests.

If performance in these respects was had, then the recorded contract of 5th of May, 1900, was notice to all subsequent purchasers that Nease no longer had any specific interest in the coal lands themselves. The record shows performance, and a performance known to and accepted by Nease. It follows that subsequent purchasers would take free from any obligation except that reserved in the deeds to R. C.

Kerens and subsequent grantors. It appears that the Coal & Coke Railway Company and the Trust Company of West Virginia (as representing the innocent holders of the bonds secured by the mortgage) are purchasers and incumbrancers for value, and without notice of any rights or equities on behalf of Nease other than as expressed in the deed from the Braxton Coal Company to R. C. Kerens, and the bill of complainant presents no equity as against them.

For the reasons stated the decree of the lower court is reversed, and the cause remanded, with instructions to dismiss the bill.

Reversed.